# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

SYNQOR, INC.,                       :
                                    :
          Plaintiff,                :   2:14-CV-286-MHS-CMC
                                    :
v.                                  :
                                    :
CISCO SYSTEMS, INC.,                :
                                    :
          Defendant.                :

_____

PARTIAL SUMMARY JUDGMENT MOTIONS HEARING

_____

*** PORTIONS OF THIS HEARING ARE CONFIDENTIAL ***


          On the 14th day of August, 2014, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Judge Caroline Craven,

Judge presiding, Texarkana, Bowie County, Texas.

          Proceedings reported by computerized stenographic

method.

                    A P P E A R A N C E S

ON BEHALF OF SYNQOR, INC.:

                    Thomas D. Rein, Esq.
                    Russell E. Cass, Esq.
                    Stephanie P. Koh, Esq.
                    Sidley Austin, LLP
                    One South Dearborn
                    Chicago, Illinois  60603
                    Telephone:  (312) 853-7000
                    Fax:  (312) 853-7036

```
 1                    A P P E A R A N C E S

 2     ON BEHALF OF SYNQOR, INC.:

 3                        Michael D. Hatcher, Esq.
                          Sidley Austin, LLP
 4                        2001 Ross Avenue, Suite 3600
                          Dallas, Texas  75201
 5                        Telephone:  (214) 981-3428

 6                        Gil Gillam
                          Gillam & Smith, LLP
 7                        First Place
                          100 East Ferguson, Suite 1017
 8                        Tyler, Texas  75702
                          Telephone: (903) 934-8450
 9                        Fax: (903) 934-9257

10
       ON BEHALF OF CISCO SYSTEMS, INC.:
11
                          William F. Lee
12                        Louis W. Tompros
                          Rachel I. Gurvich
13                        Dana O. Burwell
                          Wilmer Hale
14                        60 State Street
                          Boston, Massachusetts  02109
15                        Telephone:  (617) 526-6556
                          Fax:  (617) 526-5000
16
                          Kurt Pankratz
17                        Baker Botts
                          2001 Ross Avenue
18                        Dallas, Texas  75201-2980
                          Telephone: (214) 953-6584
19                        Fax: (214) 661-4584

20
       ON BEHALF OF VICOR:
21
                          Eric H. Findlay
22                        Findlay Craft PC
                          102 North College Avenue, Suite 900
23                        Tyler, Texas  75702
                          Telephone: (903) 534-1100
24                        Fax: (903) 534-1137

25
```

1      that's all right, your Honor.

2          THE COURT:  Sure.

3          MR. HATCHER:  They are different structures.  They

4      are different control chips, if nothing us.  What I put

5      on the screen for you, your Honor, was the data sheet

6      for the control chip in the nonisolated converter.

7      That is a different than the control chip in the

8      accused replacement non-Vicor CPNs.  It's a different

9      structure.  Thanks.

10         THE COURT:  All right.  So that takes care of 93,

11     94, 95; would that be correct?

12         MR. GARDNER:  Yes, your Honor.

13         THE COURT:  Okay.  I show that you guys wanted to

14     hear Cisco's motion No. 97 next.  Who will present

15     that?

16         MR. LEE:  I will, your Honor.  Your Honor, this a

17     tab -- the slides are tab two in the notebook I

18     provided to you.  And let me say this:  We know we've

19     inundated you with summary judgment motions.  We're not

20     asking to file anymore summary judgment motions.  I can

21     promise you that.  And we appreciate the efforts the

22     Court has taken to help us narrow the issues that might

23     get tried here.

24         This motion, actually, I think, is quite simple

25     but quite important.  After your Honor's report of

1    recommendation on the importation issue, this motion

2    implicates more than 50 percent of the remaining

3    damages.  So it's large, in terms of magnitude and

4    amount but, I think, simple in terms of the focus.  Let

5    me say why I think it's simpler.  There is no dispute

6    that there were two prior judgments rolling around

7    $100 million.  There is no dispute that both judgments

8    have been paid.  One's on appeal but we've paid a

9    judgment.  We have not appealed but SynQor has, so both

10   judgments have been paid.  There's no dispute that you

11   can't get paid twice for the same thing, so the only

12   question is, what did you get paid for?  And we say you

13   got paid for all of the bus converters that were an

14   issue and they say, no, we got paid for some, unit by

15   unit.

16       And I think, your Honor, while there is a lot of

17   dancing around on the law, there's really not much in

18   dispute.  There is a document called exhaustion that

19   the federal circuit recognizes.  We don't dispute it as

20   an affirmative defense.  We've pled it as an

21   affirmative defense.  And we state that the undisputed

22   facts demonstrate that there's been exhaustion.  The

23   question is as to what and really, your Honor, the

24   question becomes is it all or is it just some unit by

25   unit?  I think, that really captures the question.  And

1    this is a place where your Honor is not going to have

2    take our word for it or my word for it.  All we have to

3    do is take their words from the first cases and your

4    Honor will see "all" was their word and that is what

5    was done.

6         So if I go to our slides to Slide 2.  In the first

7    case, their liability testimony, your Honor, as opposed

8    from the damages testimony.  They had two experts,

9    Dr. Leeb and Dr. Reed.  Dr. Leeb was the person who was

10   establishing infringement, the liability aspect.  And

11   when he gave his testimony, he said what infringes,

12   it's all the products on Slides 18 and 19, by way of

13   example.  To show you what they were, your Honor, if I

14   could have our Slide 3.  This is their Slide 18 from

15   the presentation to the jury.  Now, your Honor will

16   notice that it's product by product.  There is nothing

17   here about unit by unit.  And if I flip back a slide.

18   May if I approach, your Honor?

19        THE COURT:  Yes.

20        MR. LEE:  Again, as I said, the word is all of the

21   known end products.  That's their word.  That's what

22   they showed on Slide 18 to the jury.  That's what they

23   showed on Slide 19 to the jury.

24        And for each supplier, your Honor, since Cisco

25   wasn't a party to that case, the first case, they said

1       all known end products, not unit by unit, infringe.

2       That was their liability testimony.  Dr. Leeb was then

3       followed by Dr. Reed, who is the damages expert but

4       there are two critical aspects of Dr. Reed's testimony.

5       First, on the question of what infringe is, he relied

6       upon Dr. Leeb.  That's not unusual at all.  The damages

7       guy is the technical person, so if I turn to our Slide

8       5, he admitted, quite honestly and correctly, that he

9       relies upon technical expert, Dr. Leeb, for his

10      analysis.

11           What did he rely upon?  Your Honor, if I go to our

12      Slide No. 6, in his April 11th, 2014 report in this

13      case, same Dr. Reed, same one who testified that he

14      relied upon Dr. Leeb in the first case, was explicit in

15      what he'd done.  And what he said is:  "SynQor's

16      technical expert, Dr. Leeb, established at the trial,

17      and the jury agreed, that all those end products used

18      the bus converters in ways that infringe SynQor's

19      patents.

20           Now, the "all" that he's referring to, your Honor,

21      is the, approximately, 30 external part numbers that

22      your Honor has seen to refer to as CPNs.  Again, not

23      Cisco's words, SynQor's words, "all" of those products.

24           Now, as your Honor knows from the many patent

25      cases you've seen, once you have had a liability

1        expert, who testifies that there is infringement of a

2        universal product, all those end products, someone has

3        to then quantity what are the damages.  Hypothetical

4        negotiation of the products.  Mr. Reed testified again

5        correctly, that there are multiple ways that he could

6        have done this.

7              If I go to our Slide 7, he says two important

8        things and I've only highlighted the second but let me

9        get the first.  Given how much of SynQor's response is

10       focused on Cisco's information, whether it was

11       reliable, he says -- this was back in 2010, your Honor,

12       before the first trial.  Cisco's information appears

13       incomplete.  Cisco wasn't a party.  Cisco was

14       responding to a subpoena.  He says it's incomplete, so

15       there are alternative ways for me to compute the

16       damages, a hypothetical negotiation, what the

17       hypothetical negotiation would produce more false

18       profits.  He said, I could have used suppliers data,

19       the data that the suppliers had.  I could have actually

20       used the Cisco data but it's incomplete.  I could have

21       used SynQor's sales projections, my own client.  He

22       said that there were multiple ways to do it.

23             So your Honor, if we just stop here for a second,

24       what we have is a circumstance where the liability

25       expert says all of these products infringe.  The

1    damages expert has said twice now, I rely upon the

2    liability expert and, four years later, looking back

3    retrospectively, he testified all these products

4    infringe.  So now, I'm going to try to quantify the

5    damages and I have multiple ways to do it.  And I'm not

6    going to rely upon Cisco's data unit by unit, sale by

7    sale because it's incomplete, so I'm going to come up

8    with a different way.

9         So if I can turn to our Slide 8, your Honor, here

10   is -- here are some key aspects of his "different way".

11   He used Cisco's U.S. and worldwide financial data.  He

12   didn't use manufacturing data.  He didn't use shipping

13   data.  He used data only available for a certain period

14   of time, so he had to extrapolate.  And he used average

15   rates for periods for each of the different products.

16   And when that material wasn't available, he used

17   company-wide numbers.  But I don't think, your Honor,

18   the details of this are as important as the fact that

19   he said I have multiple ways of doing it.  Here's the

20   way I'm doing it.  I'm going to rely on worldwide data,

21   not U.S. data.  I'm going to extrapolate where I need

22   to extrapolate.  And where there is information that is

23   not available, I'm going to use company-wide

24   importation rate 49 percent.  So he said I can't use

25   the Cisco manufacturing data.  I can't use the Cisco

1    shipping data, it's incomplete, so here's the way I'm

2    going to estimate what the damages are.  He did.  The

3    jury accepted his testimony.  As he said himself, it

4    covered all of the products.  While SynQor now would

5    like to walk away from the "all" products, what Judge

6    Ward and Judge Schneider did in prior cases, the way

7    they articulated it, we think, is instructive.

8        If you go to Slide No. 9, Judge Ward phrased it

9    this way:  "The damages model presented to the jury was

10   based on sales made, at least through October 31, 2010.

11   This is consistent, your Honor, with Dr. Reed's

12   testimony that everything a supplier sold in that

13   period of time infringed.  It was consistent with the

14   way that Dr. Reed then characterized Dr. Leeb's

15   testimony and this is how Judge Ward articulated it,

16   sales made during periods of time.  Not unit by unit,

17   not some of the sales, not some that you have to

18   improve.  And he did so for the supplemental damages as

19   well.  Judge Schneider, if I turn to page 10 in the

20   '444 case, he adopted the same protocol and framework

21   of Judge Ward and he did it on the basis of time

22   periods.  Again, not some of the bus converters sold

23   during that time period, not unit by unit but

24   everything sold in that period.

25       Now, SynQor's response, your Honor, in the briefs

1        and this is in their sur-reply on page 3, note 1, I

2        think, is pretty revealing.  Their answer is that these

3        statements by Judge Ward and Judge Schneider are a

4        shorthand that don't really reveal what they were

5        doing.  Now, I don't know how you do that if you're not

6        the author of the opinion but, I think, Judge Ward and

7        Judge Schneider were both pretty clear on what they

8        were doing.  It wasn't a shorthand.  The reason they

9        had to characterize it that way is this:  Judge Ward

10       and Judge Schneider were characterizing it 100 percent

11       accurately, based upon the evidence that they saw and

12       the arguments that SynQor made.  The only way you can

13       back away from that and go unit by unit is to try to

14       characterize this as the two federal judges not quite

15       meaning what they say in the words.

16            There is a reason that Judge Ward and Judge

17       Schneider did this because, your Honor, SynQor actually

18       opposed a unit by unit damage analysis in the first

19       cases.  They opposed it because of this incompleteness

20       in the records that Dr. Reed had mentioned.  And I

21       think, I can show you their opposition to the very

22       method that they now claim to use.

23            If I go to Slide 11 and I go back to the opening

24       statement in the '444 case, SynQor says to the Court,

25       "They," that's the defendants, "will ask that damages

1    be limited to the units they admit went into the United

2    States."  So the defendants, the suppliers, your Honor,

3    in that case, are saying, let's do it unit by unit.

4         Slide 12, if we could.  SynQor would never agree

5    to that.  This goes back to this question of the

6    incompleteness of Cisco's records.  But the opening in

7    the '444 case says SynQor would never agree to that.

8    So we have the suppliers saying let's go unit by unit,

9    SynQor saying, we would never agree to that, based on

10   Cisco's own reporting.  And as a result, I go to Slide

11   13, your Honor, that's why Mr. Reed proposed the damage

12   model that multiplied per unit price by expected

13   importation percentages, rather than unit by unit.

14        And critically important, your Honor, to hold

15   SynQor to what I said before, if I go to Slide 14,

16   SynQor said something that we agree with completely.

17   The hypothetical negotiation is one that happens just

18   before the infringement begins, based upon the party's

19   expectations at the time of the negotiation.  That's

20   what Mr. Reed tried to capture and he didn't do it unit

21   by unit.

22        If -- your Honor, I looked for an analogy that

23   would help me understand what they are trying to say

24   and the best I could come up and no analogy is as

25   perfect as this.  If you assume that, you know, an

1    employee has served -- say, a salesperson working on a

2    commission.  He or she has been terminated.  He sues

3    for wrongful termination.  He establishes liability.

4    He says I should have been able to work another year.

5    He has several different options for computing damages.

6    You could project the sales that he might make.  He

7    could project the sales of the company and divide by

8    the number of sales.  He could use the sales from his

9    last pay period, he could use the sales this last

10   period.  To use the analogy here, he takes total past

11   sales as a rough estimate divided by the number of

12   salespeople and says, that's about why we got it and he

13   gets an award.  It turns out that the person who got

14   his job afterwards actually makes more sales than he

15   projected.  He can't come back and say no, I'm entitled

16   to more now.  There's one fact that I'm 100 percent

17   certain about and I'm 100 percent sure and they will

18   agree with me at least on this one fact.  If the actual

19   importation rate had come in lower than they used, they

20   wouldn't have called us up and said, we have a check

21   for you.  We asked for too much.  I promise you that

22   they wouldn't do that.  Why?  Because this is their

23   estimation of damages.  So the question becomes what's

24   the consequence of this and we say the consequence of

25   this is we can enter the all or some question as it's

1     all.

2          If I go to Slide 15.  Mr. Reed, says, "I have

3     alternative calculations" -- I have alternative

4     calculations for what, Slide 16, Dr. Leeb tells us it's

5     alternative calculations for all of the known products.

6     And you know, your Honor, when you trying to thread a

7     needle to come up with a different damages theory that

8     is one that you've basically imposed before, it's hard

9     work.  And I think, just how hard the work is, is

10    demonstrated by Slide 17, which is actually their

11    sur-reply in this case.  Literally, just weeks ago.

12    They accuse us of ignoring the fact that the '497 jury

13    verdict specifically asked the jury to determine the

14    amount of infringement caused by the defendants.  That

15    is the supplier.  Those are the folks that sold all of

16    those components.  We suggest, your Honor, if you agree

17    with us, that they asked to be compensated for all

18    during a period of time, then the ma near case, the

19    life span cases say it is exhausted.

20         If your Honor needed an objective fact that would

21    demonstrate that, really, there was exhaustion and the

22    theory that SynQor is offering now, is an effort to

23    basically rewrite the record and to adopt a model that

24    they have actually checked in the opening judge

25    Schneider, here is the best indication.  In the prior

1          cases, SynQor focused on sales to Cisco.  Today, in

2          this case, they are focusing on sales by Cisco.  And

3          the Court may ask yourself the same question we asked

4          ourself, why?  You know, if you're just trying to get

5          compensation for things that weren't covered before,

6          why are you doing that?  And I think, I can demonstrate

7          to you very quickly just why.  Mr. Reed was deposed in

8          this case -- if I go to Slide No. 18.  And he was asked

9          this:  Let's say that there was -- and I can summarize

10         this for your Honor, with the highlight on the board.

11         Let's say that there was a converter sold to Cisco on

12         July 20, 2011.  Would that have been one of the ones

13         that was sold to Cisco in the '497 case?  He said yes.

14         Now, let's say it sits in Cisco's inventory and it gets

15         sold after January 30th.  Are you not counting that

16         same converter again?  He said yes.  They have to

17         change the model to address the fact that they are

18         trying to come up with a way to navigate what they said

19         before.

20              So your Honor, a very quick animation.  If I go to

21         Slide 19, this is what they -- this summarizes, I

22         think, what I've tried to describe today.  When they

23         were suing the suppliers, in both the '497 and '444

24         cases, which covered the period from July of 2006 to

25         April of 2011, they said all of the products infringe

1       and then, they used worldwide sales importation rate,

2       royalty and they obtained awards of $100 million and

3       they say they have been paid.

4             Now, if I go to Slide 20, they are saying that

5       there are units that were sold by Cisco to its

6       customers and we want another $23 million.  That's why,

7       your Honor, it remains about the remaining 23 million.

8       The problem with that is what we demonstrate on Slide

9       21.  If you had a bus converter sold to Cisco in this

10      period but then not sold by Cisco till the second

11      period, they want to be compensated twice.  And the law

12      dun doesn't allow you to collect twice.  So your Honor,

13      I know that there's been some complexity to the motions

14      but in this case, as I said, to reiterate, there's no

15      dispute, there were two prior judgments.  There's no

16      dispute that they were paid.  There's no dispute that

17      both judges described them as covering time periods.

18      There's no dispute that they described them as "all

19      products".  There's no dispute that they rejected and

20      opposed a unit by unit analysis.  If the Court accepts

21      their word, which is they were covering all, not some,

22      then, they are exhausted to April 11th, 2011 and that

23      has a substantial narrowing effect of the case.

24            One last point, your Honor, there are 15,000 old

25      CPNs that were sold by Aztec and others that are not

1      part of this motion.  Your Honor, doesn't need to sort

2      through this.  An order that said anything -- all units

3      that were covered by the '497 and '444 time period are

4      exhausted, would substantially narrow the case.  My bet

5      is those few thousands, we could deal with, even as

6      part of the trial.  Thank you, your Honor.

7          THE COURT:  Thank you.

8          MR. REIN:  Your Honor, Stephanie Koh will argue

9      for SynQor.

10         MS. KOH:  Your Honor, may I approach with some

11     slides?

12         THE COURT:  You may.

13         MS. KOH:  Good morning, your Honor.  Stephanie Koh

14     for SynQor.  On this motion, the Court needs to

15     determines to what degree there has been exhaustion or

16     an implied license that limits damages.  And the

17     keyword there is "limits".  I think, that Mr. Lee and

18     Cisco would agree.  Regardless of what the ruling is,

19     other than the quantification of damages, the issues in

20     this case will remain the same.  The exhaustion and

21     implied license issues only apply to what the parties

22     refer to as the old CPNs.  And the old CPNs will be at

23     issue in the case, no matter what the Court rules on

24     this motion because even Cisco does not contend that

25     this defense would take the old CPNs out of the case

1      reason for denying Cisco's motion.  Thank you.

2           THE COURT:  Thank you.  Is it going to be long?

3      Would this be a good time to take a break?

4           MR. LEE:  No.  I can be relatively brief, your

5      Honor.  Then we'll be halfway through, which might be

6      good.

7           THE COURT:  Okay.

8           MR. LEE:  Let me do it this way.  I think I can do

9      it quickly.  The allegation of this case is completely

10     unprecedented in there's no case citation.  All the

11     Court needs to do is read the cases and the principles

12     of exhaustion to know that's not true.  But actually,

13     you don't even need to do that, your Honor.  You can

14     just actually take their own argument.  They concede

15     that any products that were the subject to the damage

16     award are exhausted.  They concede that, right?  They

17     claim that there are more but they concede that the

18     reason there's not a case that deals precisely with the

19     circumstances, it's a proposition that is so obvious

20     that they don't even contest this.

21          Point No. 2, your Honor, is this and I think this

22     actually is, respectfully, just an effort to send us

23     off on a wild goose chase.  There's this constant

24     reference to not being compensated for Cisco's direct

25     infringement.  Your Honor, we're not asking you to find

1      exhaustion as to the Vicor parts.  We're not asking

2      your Honor to find exhaustion as to the new parts.

3      We're not asking your Honor to find exhaustion as to

4      those 15,000 parts.  Exhaustion applies to the parts

5      sold by the suppliers in the '497 and '444 case.  And

6      if you've collected from them, as the indirect

7      infringer, you can't collect twice.  So this constant

8      drum beat about Cisco's direct infringement, we are

9      seeking to exhaust only those that were based upon the

10     suppliers in the first cases, where the predicate act

11     was Cisco's direct infringement and no more.

12          And on this issue and, I think, your Honor, there

13     was no dispute that the issue was at the first two

14     trials, was it all or some units that were at issue.

15     And if I could have our Slide No. 6.  When your Honor

16     considers how this motion should be decided, if you

17     would consider two critical slides, I think, it'll help

18     us get to where we need to be.  This is their expert.

19     This is their damages expert.  This is years after the

20     first verdict.  And when all of the issues in play here

21     have been set forth in great detail.  And he says that

22     Dr. Leeb established that all those end products, all,

23     infringed and he was correct.  And this unit by unit

24     stuff -- argument that your Honor is hearing today,

25     Mr. Reed didn't accept because it's not true.  And in

1    fact, the reason he didn't accept it, if I go to Slide

2    11, is because they said they are not going to do it

3    unit by unit.  They said at the '444 case, that the

4    defendants asked to be unit by unit.  Go to Slide 12.

5    They said we're not going to do it that way.  So the

6    entire, I'd say, 50 percent of the argument that was

7    just made, that urges, your Honor, that they did it

8    unit by unit, this is exactly what they opposed doing.

9          Now, there was a lot about the incompleteness of

10   Cisco's records and I think, I wrote this down.  It's

11   now known that the records were incomplete.  Your

12   Honor, if I go back to Slide 7, they said four years

13   ago that the records were incomplete.  Now, they could

14   have moved to compel.  They could have sought the

15   records to be more complete.  Could have reopened the

16   judgment.  There's lots of things they could have done,

17   right, but they knew, the idea that they know they were

18   incomplete, they knew they were incomplete then but

19   they wanted to get compensation for, in their words,

20   all of the infringement.  So the idea that it's now

21   known they were incomplete and that should be a

22   different result is not right.  And I was listening

23   carefully to see that if they would say that the

24   numbers come up the other way and there had been fewer

25   shipments by Cisco, whether they would have reimbursed

1    us, the answer is certainly no.

2         Now, the very first part of the their argument,

3    your Honor, was whether this would narrow the case.  It

4    would in terms of dollar allotted.  But hear is the

5    other questions, your Honor.  Someone has to determine

6    what units were in and what units were out.  That's one

7    of the tribal issues they suggest, your Honor.  So they

8    are suggesting that the next jury figure out what units

9    were in and what units were out and then compensates

10   for units out.  Is the next jury supposed to look at

11   Judge Ward's statement and decide where it was a

12   shorthand?  Are they supposed to look at Judge

13   Schneider's statement and decide whether it was a

14   shorthand?  Are they supposed to look back at what

15   Mr. Reed said?  No.  That's why this is a legal issue.

16   And the legal issue, I think, is simple.  Did they seek

17   all or some?  And their own words said that they sought

18   all.  Their own words said that they were not seeking

19   some.  And they are now asking, your Honor, to permit

20   them to pursue the theory that they actually rejected

21   in the '444 case and to require the jury to figure out

22   which units were in and which units were out on this

23   record.  That's not an issue for the jury.  That's an

24   issue for the Court.

25        And it is, there is exhaustion laws clear.  I say

1    it parenthetically, the reason the implied license

2    issue has come in is because it has nothing to do with

3    this motion.  It's an effort to move up the

4    hypothetical negotiation date.  Exhaustion is the right

5    doctrine.  When your Honor enters the final judgment in

6    the case, the judgment's paid, that's it for that was

7    which was at issue.  This is a circumstance where they

8    made a decision to see decide to sue our suppliers

9    first, to not have Cisco in the case, where they knew

10   that our records were, in their words, incomplete and

11   to adopt a model to compensate them for all the

12   infringement.

13        Now, let me suggest this final word, your Honor,

14   because there's -- the one thing I'm pretty sure now is

15   we're not, today, trying to adjudicate the reasons that

16   Cisco's records were incomplete.  But if you remember

17   from Mr. Hatcher's presentation, he described how these

18   bus converters were part of a bigger printed circuit

19   boards that were part of these bigger products.  Cisco

20   sells the bigger products and its system is set up to

21   sell and track the bigger products.  It's not set up,

22   necessarily, to track which particular bus converter on

23   this particular printed circuit board made it into this

24   router or receiver.  And when we got to the second go

25   around, we went back and reconstructed as best we

1    could.  But in some sense, it doesn't matter.  The most

2    critical fact is this:  They knew that non-party Cisco

3    -- non-party because they chose to sue our suppliers.

4    They made an issue of our indemnity in the first case,

5    so the jury knew we were there.  They decided to

6    basically seek compensation for it.  All of the

7    converters sold by those defendants.  They adopted a

8    model to compensate them for all the converters sold by

9    those defendants.  And all we're saying is, on those

10   facts, you're exhausted as to all the converters sold

11   by those suppliers.  Thank you, your Honor.

12        THE COURT:  You're welcome.

13        MS. KOH:  Very briefly, if I could, your Honor.

14   Cisco keeps contending that SynQor sought compensation

15   on all the units.  We did not, did not seek

16   compensation on all of the units.  We were indisputably

17   not compensated on approximately 50 percent of the

18   units.  There is no basis for saying that we were

19   compensated on all of the worldwide sales, none.  We

20   were not compensated on all of the sales.

21        Mr. Lee again talked about the end products used

22   bus converters in a way that infringed.  All of the bus

23   converters were used in a way that infringes.  But that

24   does not say that we were compensated on all of them or

25   that all of them were in the damages base.  They