Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 2 of 23
PageID #:  41560,

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| SYNQOR, INC. | § | |
| | § | |
| V. | § | No. 2:14-CV-286-MHS-CMC |
| | § | SEALED |
| CISCO SYSTEMS, INC. | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. Before the Court is SynQor, Inc.'s Motion for Partial Summary Judgment (Docket Entry #91) and Cisco Systems, Inc.'s Motion for Partial Summary Judgment (Docket Entry #96). The Court, having considered all the relevant briefing, recommends Cisco's motion be **GRANTED** and that SynQor's motion be **DENIED**.

### I. BACKGROUND

On January 28, 2011, SynQor, Inc. ("SynQor") filed suit against Cisco Systems, Inc. ("Cisco") and Vicor Corporation ("Vicor"), alleging infringement of six patents-in-suit: U.S. Patent Nos. 7,072,190 ("'190 Patent"), 7,269,034 ("'034 Patent"), 7,272,021 ("'021 Patent"), 7,558,083 ("'083 Patent"), 7,564,702 ("'702 Patent") and 8,023,290 ("'290 Patent"). *See* Cause No. 2:11cv54. On March 31, 2014, the Court ordered SynQor's claims against Cisco and against Vicor be severed into two newly-created cases, with SynQor's claims against Cisco being severed into the above case.

On June 30, 2014, the parties filed cross motions for partial summary judgment regarding whether "pass through shipments" of Cisco's products should be declared "imports" under 35 U.S.C. § 271(a). SynQor does not dispute that for the pass through shipments, the accused

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 3 of 23 PageID #: 41561

products are made in, sold to, shipped from, and shipped to non-U.S. locations. The sole basis on which SynQor alleges infringement for the pass through shipments is that they pass through a United States airport, customs bonded zone, or foreign trade zone while in transit from one foreign country to another (without clearing customs in the United States).

Cisco asserts such pass through shipments are not importations into the U.S. under §271(a) and cannot be the basis for a claim of infringement. SynQor asserts Cisco products that enter the United States while en route between a non-U.S. origin and a non-U.S. destination constitute imports pursuant to § 271(a). SynQor also moves for partial summary judgment that Cisco is the importer under §271(a) for the importations that occur when Cisco's products are shipped outbound from Cisco's Shipping Logistics Center in Zappopan, Jalisco, Mexico, enter the U.S. at rates stipulated by the parties, and then continue en route to a non-U.S. ultimate destination. According to Cisco, if the Court determines that a party imports under §271(a) when an accused product passes through the U.S. en route between two foreign countries, there are disputed material facts regarding which entity actually imports these products. Cisco further asserts, if the Court finds the disputed pass through shipments do not qualify as imports under § 271(a), then the issue of which entity imports the accused products is moot.

According to Cisco, there are no factual disputes precluding the Court from deciding whether pass through shipments are or are not acts of infringement pursuant to § 271(a). There is a factual dispute as to whether Cisco is the legal owner of its products at the time all outbound pass through shipments occur and also as to whether Cisco controls all outbound pass through shipments from the Mexico shipping logistics center.

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 4 of 23
PageID #:  41562

## II. STATEMENT OF FACTS



Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 5 of 23
PageID #:  41563

The shipments that are the subject of this motion have been referred to by the parties as "pass through shipments." The parties have defined "pass through shipments" as "an instance in which an accused product passes through a United States airport, customs bonded zone, or foreign trade zone while in transit from one foreign country to another foreign country, without clearing customs in the United States." *Id.* at ¶ 1.

4

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 6 of 23
PageID #:  41564



Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 7 of 23
PageID #: 41565



### III. THE PARTIES' POSITIONS

**A.      SynQor's assertions**

SynQor asserts Cisco is the importer of infringing products that pass through the U.S. en

route to a non-U.S. destination. SynQor asserts its position is supported by Federal Circuit

precedent, the ordinary definition of "import," and the structure and history of the addition of

"import" to § 271(a). According to SynQor, other jurisdictions have reached the same conclusion

and, while policy considerations should not be considered by the Court, the U.S. does have

interests in protecting patent rights. SynQor also contends the Court should find Cisco is the

importer for all products passing through the U.S. when leaving Mexico en route to non-U.S.

destinations and accordingly is liable for infringement for these shipments.

**B.      Cisco's assertions**

Cisco agrees summary judgment is appropriate to decide the meaning of "imports" under

35 U.S.C. § 271(a). According to Cisco, temporary transit of an allegedly infringing product

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 8 of 23
PageID #: 41566

through the U.S. as part of a pass through shipment does not constitute infringement. Specifically, Cisco contends a product is imported only when brought into a country for some commercial purpose, which is similar to approaches in other jurisdictions. Cisco further alleges Congress added "imports" to § 271(a) to harmonize U.S. and international patent law, and the Court should consider the initial international agreements and subsequent interpretations. Cisco also argues SynQor's construction is contrary to the need for strict construction of a patent holder's domestic monopoly and is concerned SynQor's construction of § 271(a) could have a chilling effect on global commerce and U.S. foreign relations.

Cisco argues summary judgment is inappropriate for deciding who owns products leaving Mexico en route to non-U.S. destinations. According to Cisco, there is a factual question of who owns the products and who controls shipments outbound from Mexico. Accordingly, Cisco asserts the Court should reserve judgment on this issue until the facts are resolved.

## IV. LEGAL PRINCIPLES

In a motion for summary judgment, the moving party has the initial burden of showing that there is no genuine issue of any material fact and that judgment should be entered as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). Summary judgment is appropriate in patent cases. *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994) (citations omitted) (affirming summary judgment). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). An issue is "material" where it involves a fact that might affect the outcome of the suit under the governing law of the underlying cause of action. *See Burgos v. S.W. Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir. 1994) (*citing Anderson*, 477 U.S. at 248). Once the movant has shown the absence of material fact issues, however, the opposing party has a duty to respond, via affidavits or other means,

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 9 of 23
PageID #:  41567

asserting specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Summary judgment may be employed to limit the number of issues presented at trial. *See, e.g., Gatt Trading, Inc. v. Sears, Roebuck & Co.*, No. Civ. A. 3:02-CV-1573, 2004 WL 2511894, at *5, n. 12 (N.D. Tex. Nov. 8, 2004). *See also Ozee v. Am. Council on Gift Annuities*, 888 F. Supp. 1318, 1321 (N.D. Tex. 1995) ("[A] major benefit of partial summary judgment is to accelerate or to expedite litigation by framing and narrowing the triable issues.")(internal citations and quotation marks omitted).

## V. DISCUSSION

**A.     Whether Cisco's pass through shipments constitute "imports" under § 271(a)**

SynQor's infringement claim is filed pursuant to 35 U.S.C. § 271(a), which provides as follows: "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."   A patent holder cannot use its U.S. patents to restrict activities that occur wholly outside the United States. *See, e.g., Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007)("The traditional understanding that our patent law operates only domestically and does not extend to foreign activities is embedded in the Patent Act itself, which provides that a patent confers exclusive rights in an invention within the United States." (internal citations and quotation marks omitted)).

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 10 of 23   PageID #: 41568

SynQor is not asserting that Cisco's allegedly infringing products were made, used, offered for sale, or sold in the U.S.  The only issue is whether a party that makes a "pass through" shipment of a product "imports" that product "into the United States."

## 1.   Whether the ordinary meaning of "imports" requires an intent to sell

SynQor uses dictionary definitions to support its argument that the ordinary meaning of the word "imports" does not require a commercial purpose.  When determining the meaning of a statute, "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (citing *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004)).  "Imports" is not defined within the text of § 271, and both parties assert its ordinary meaning supports their construction.

SynQor cites Webster's Third New International Dictionary, which defines "import" as "to bring (as wares and merchandise) into a place or country from another country." Webster's Third New Int'l Dict. 1135 (3d ed. 1981).  SynQor also quotes The Random House College Dictionary which defines "import" as "to bring in (merchandise) from a foreign country for sale, use, etc." and argues "etcetera" indicates the product could be imported for any purpose. The Random House Coll. Dict. 668 (4th ed. 1973).  Black's Law Dictionary defines it as "1. A product brought into a country from a foreign country where it originated… 2. The process of bringing foreign goods into a country." Black's Law Dictionary (9th ed. 2009).  According to SynQor, these definitions support its position that any product shipped into a country constitutes an import, and no commercial intent is required by the importer.

On the other hand, Cisco references the American Heritage Dictionary, which defines "import" as "to bring or carry in from an outside source, esp. to bring in (goods) from a foreign country for trade or sale," and places emphasis on the phrase "for trade or sale." American

Case 2:14-cv-00286-MHS-CMC   Document 200   Filed 09/29/14   Page 10 of 22 PageID #:
41606
Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 11 of 23
PageID #: 41569

Heritage Dictionary 646 (2d Coll. Ed. 1985). Cisco also notes the Random House definition,

cited by SynQor, qualifies imports as products "for sale, use, etc." indicating some commercial

purpose necessary for a product to qualify as an import.

The conflicting dictionary definitions offered by the parties do not resolve the question of

whether § 271(a)'s "imports" language requires intent to sell the product in the United States.

Accordingly, the Court considers the legislative history and structure of § 271.

**2.      Legislative History and Statutory Structure**

In 1994, Congress modified the statute in question, 35 U.S.C. § 271, by inserting "or

imports into the United States any patented invention." *See* Uruguay Round Agreement Act, Pub.

L. No 103-465, § 533(a)(1), 108 Stat. 4809, 4988 (1994). The change was made to implement

Trade-Related Aspects of Intellectual Property Rights ("TRIPS") Agreement, which states in

Article 28, under Patents:

> Rights Conferred 1. A patent shall confer on its owner the following exclusive
> rights: (a) where the subject matter of a patent is a product, to prevent third parties
> not having the owner's consent from the acts of: making, using, offering for sale,
> selling, or importing for these purposes that product.

Cisco places emphasis on the "for these purposes" language of the act, asserting the

addition of "imports into the United States" into § 271(a) after "makes, uses, offers to sell, or

sells" implies a product is only imported if done so for one of the listed purposes. Cisco further

asserts Congress intentionally placed importation "squarely among" commercial activities which

affect the domestic demand for the patentee's products (i.e., manufacture, use, offer to sell, and

sell) throughout § 271. (Docket Entry #96 at pg. 6); *see, e.g.,* 35 U.S.C. § 271(e)(4)(B)-(C)

(wherein Congress provides for injunctive relief to "prevent the *commercial* manufacture, use,

offer to sell, or sale within the United States *or importation* into the United States"); § 271(c)

("offers to sell or sells within the United States or imports into the United States").

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 12 of 23   PageID #: 41570

Cisco further contends TRIPS was intended to harmonize worldwide patent law. Another signatory to TRIPS, the United Kingdom, has construed "imports" to limit liability to importation for commercial purposes, such as making, using, selling, or offering the infringing product for sale. *See* Terrell on Patents § 14-41 (Sweet and Maxwell 2013). Terrell states as follows:

> Section 60(1) of the 1977 Act on its face appears to prohibit importation for any purpose; but it is to be interpreted consistently with Article 25 of the [Cooperative Patent Classification] which refers to 'making, offering, putting on the market or using a product which is the subject-matter of the patent, or importing or stocking the product for these purposes.' The purpose for which the importation takes place may therefore be material, although a commercial purpose can ordinarily be inferred.

*Id.* According to Cisco, the word "imports" was added to § 271(a) to harmonize U.S. patent law with the laws of other nations. *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1253 (Fed. Cir.2000) (recognizing the purpose of the TRIPS agreement was to harmonize worldwide patent law and discussing patent law in the United Kingdom). Because TRIPS was intended to harmonize international patent law and § 271(a) implements TRIPS, Cisco asserts § 271(a) should be interpreted consistently with other signatories of TRIPS, such as the U.K.

According to SynQor, "nothing in the TRIPS agreement prohibits signatory countries from offering a patent holder a broader scope of protection than the minimum bundle of rights set forth in the TRIPS agreement," and "that is what Congress expressly chose to do by specifying that 'imports into the United States' are infringements, rather than adopting the more restrictive 'imports for these purposes' language from the TRIPS agreement." (Docket Entry #91 at pgs. 6-7). In other words, SynQor contends Congress expressly-although silently-omitted "for these purposes," intentionally broadening the definition of imports to encompass both commercial and non-commercial uses. SynQor argues "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 13 of 23 PageID #: 41571

statutory language that it has earlier discarded in favor of other language." *Id.* at pg. 7 (quoting *Nachman Corp. v. Pension Ben. Guaranty Corp.*, 446 U.S 359, 392-93 (1980)). According to SynQor, when Congress passed legislation to implement the TRIPS agreement, it affirmatively chose not to adopt the "importing for these purposes" language, instead choosing to define "imports" – with no specific purpose required – as infringement. (Docket Entry #108 at pg. 3). Thus, SynQor asserts the text of the TRIPS agreement should not be used to determine what constitutes infringement.

SynQor also claims § 271(e)(4)(B)-(C), relied upon by Cisco, shows Congress knew how to limit importation to commercial applications, but it chose not to do so for the purposes of § 271(a). SynQor further asserts the omission of "commercial" from 35 U.S.C § 271(a) and its appearance in other subsections of § 271 indicates "imports" in § 271(a) does not require a "commercial" or any particular purpose. *See Russello v. U.S.*, 464 U.S. 16, 23 (1983)("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *U.S. v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). According to SynQor, Cisco's proposed reading of the statute violates this canon of statutory constriction.

The Court is not convinced Congress, by silence, sought to differentiate § 271(a) from the statutes to which it was being harmonized:

> As one court has aptly put it, 'not every silence is pregnant.' In some cases, Congress intends silence to rule out a particular statutory application, while in others Congress' silence signifies merely an expectation that nothing more need be said in order to effectuate the relevant legislative objective. An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent.

*Burns v. United States*, 501 U.S. 129, 131-32 (1991) (internal citation omitted).   SynQor references no support for its assertion that Congress discussed or intended to diverge from the language of the TRIPS agreement.

According to SynQor, not only did Congress fail to adopt the "imports for these purposes" language from the TRIPS agreement, but it also failed to adopt the "commercial . . . importation" language of § 271(e), further evidencing Congress did not intend to require a commercial purpose.   However, Cisco asserts § 271(e) specifically created an "artificial act of infringement" that consists of clearly non-commercial activity – submitting an abbreviated new drug application ("ANDA").   *See Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990)("Not only is the defined act of infringement artificial, so are the specified consequences, as set forth in paragraph (e)(4). Monetary damages are permitted only if there has been 'commercial manufacture, use, or sale.'").   According to Cisco, Congress made it clear that injunctive relief can be granted or damages awarded only if the purpose of the submission of an ANDA is to obtain approval to engage in the commercial manufacture, use, or sale of a drug claimed in a patent before the expiration of the patent – i.e., if the purpose is to interfere with the patentee's domestic monopoly, the relevant issue according to accepted principles of direct infringement.

Finally, SynQor asserts Cisco's view that importation pursuant to § 271(a) requires an intent to sell would require an examination of the alleged infringer's intent in circumstances such as this in order to determine whether direct infringement has occurred.   According to SynQor, this is contrary to Federal Circuit precedent holding that direct infringement is a strict liability offense. *See, e.g. In re Seagate Tech., LLC*, 497 F.3d 1360, 1368 (Fed. Cir. 2007)("patent infringement is a strict liability offense"); see also *Hilton Davis Chem. Co. v. Warner-Jenkinson*

*Co.*, 62 F.3d 1512, 1527 (Fed. Cir.1995)(en banc)("[I]ntent is not an element of direct infringement, whether literal or by equivalents. . . . Infringement is, and should remain, a strict liability offense."), *rev'd on other grounds*, 520 U.S. 17, 35 (1997).

In its surreply to SynQor's motion, Cisco asserts it is undisputed that to infringe under § 271(a), the act of importation must intrude upon the patentee's domestic monopoly. Cisco contends SynQor's argument that § 271(a) is a strict liability statute misses the point. According to Cisco, looking to whether a commercial purpose or intent to sell underlies an importation is merely a way to determine whether an act of importation alleged to infringe intrudes upon a patentee's domestic monopoly. The Court agrees and considers how other courts have interpreted § 271(a).

**3.    Consideration of case law**

Because the statute does not define "imports into the United States" and the term has received relatively little interpretation, both parties reference case law from other jurisdictions in support of their positions. SynQor relies on *Fellowes, Inc. v. Michilin Prosperity Co., Ltd.*, 491 F. Supp. 2d 571 (E.D. Va. 2007), asserting the products were not imported for sale, but rather to obtain approval from Underwriters Laboratories, Inc. ("UL"). Cisco asserts SynQor ignores that the Fellowes court went on to reason that this approval was "another nail in the coffin as to an infringing 'offer to sell' and 'sale' on the part of Michilin because [the products] *must* be certified by UL before the can be sold in the United States." *Id.* (emphasis in original).

In *Fellowes*, a case which specifically interprets § 271(a), the court first found the defendants Michilin and Intek made "sales" and "offers to sell" of the accused shredders within the scope of § 271(a), noting the United States was the destination of the majority of the accused shredders; the vendor agreements allowing these sales to occur were negotiated and executed in

14

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 16 of 23
PageID #: 41574

the United States and governed by U.S. state laws; the price quotes for the shredders were sometimes sent but always received in the United States; Michilin directly communicated and negotiated with its U.S. customers; the commercial invoices themselves showed the sales were made to retailers in the United States; payment was made by the retailer directly to Michilin in many instances; and Intek acted as a pass-through. *Id.* at 582-83. The court then addressed the separate basis for liability: the "unauthorized importation of infringing devices into the United States" under § 271(a). *Id.* at 583.

According to the court, the language of § 271(a) distinguishes "imports" from both "sells" and "offers to sell." *Id.* The court stated an "importation of an infringing product [under § 271(a)] need not include, nor be followed by, a sale, offer to sell, or any other particular course of action; the infringing activity is the unauthorized importation of an infringing product itself." *Id.* The court then specifically noted Michilin admitted in its Answer to sending the "first shredder of each model of shredders (intending to be offered for sale in the United States) to Underwriters Laboratories, Inc. (UL), in the United States solely to obtain UL approval thereof. . . ." *Id.* The court went on to add that to say Michilin did not "import those shredders sent to UL would defy logic since there is no evidence that anyone else played any role in their delivery to UL." *Id.* According to the court, unless Michilin could show a different definition of the word "import" than that contained in any recognized English language dictionary, these shredders sent to UL necessarily were "import[ed] into the United States." *Id.*

The facts involved in *Fellowes* indicate the defendants' shredders were actually imported under circumstances that evidenced an intent to sell. Interestingly, one of the dictionary definitions quoted in the *Fellowes* case supports Cisco's position. *Id.* (quoting The Random

Case 2:14-cv-00286-MHS-CMC   Document 200   Filed 09/29/14   Page 16 of 22 PageID #:
41612
Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 17 of 23
PageID #: 41575

House Coll. Dictionary (4th ed. 1973)(defining "import" as "to bring in (merchandise) from a foreign country for sale, use, etc.")).

In *Athena Feminine Techs., Inc. v. Wilkes*, 2011 WL 4079927 (N.D. Cal. Sept. 13, 2011), also relied upon by SynQor, the court held "[u]nder the plain terms of § 271(a), the act of importation, standing alone, is sufficient to state a claim for direct infringement." *Id.* at *4. The *Athena* court cited *Fellowes* for the proposition that to directly infringe under § 271(a), an importation of an infringing product need not include, nor be followed by, a sale, offer to sell, or any other particular course of action; the infringing activity is the unauthorized importation of an infringing product itself. However, in *Athena*, the infringing party was importing a product with clear intentions to sell it within the U.S.; in contrast, Cisco's products are passing through with no plans for sale within the U.S.

Not only was the *Athena* court ruling on a Rule 12(b)(6) motion to dismiss, but it also decided the issue without having heard from the defendants ("Tellingly, Defendants completely fail to respond to Athena's argument in their reply."). *Athena*, 2011 WL 4079927 at *4. Cisco's argument here is not that an importation needs to include or be followed by a sale or offer to sell but that it requires an intent to sell, or at the very least, a commercial purpose that interferes with the patentee's domestic monopoly.

SynQor also relies on cases interpreting 35 U.S.C. § 271(g). *See Tr. Of Columbia Univ. v. Roche Diagnostics GmbH*, 272 F. Supp. 2d 90, 108-09 (D.Mass. 2002) (rejecting as irrelevant argument that defendant "merely shipped" infringing goods for non-commercial purpose and holding that "import" as used in §271(g) has its "plain ordinary meaning of bringing goods into the United States") (citation omitted); *Bristol-Myers Co. v. Erbamont, Inc.*, 723 F. Supp. 1038, 1042-44 (D. Del. 1989) (importation under § 271(g) does not "require an analysis of the intent of

Case 2:14-cv-00286-MHS-CMC   Document 200   Filed 09/29/14   Page 17 of 22   PageID #:
41613
Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 18 of 23
PageID #:  41576

the person in bringing the goods into the United States," and "it is not necessary that the goods in

issue have passed through U.S. Customs to be imported under § 271(g) and § 9006 of the Act.").

Both the *Roche* and *Bristol-Myers* decisions interpreted "imports" under § 271(g), which creates

liability for products created by processes patented in the U.S. In *Zoltek Corp. v. U.S.*, 672 F.3d

1309 (Fed. Cir. March 14, 2012), the Federal Circuit Court of Appeals considered whether

importing a product using a patented process under § 271(g) rendered the government subject to

a suit for patent infringement under 28 U.S.C. § 1498(a).   The court noted the purpose in

adopting § 271(g) was to "harmonize United States law with that of the rest of the industrialized

world, in which most countries patent laws are structured so that the direct product of a patented

process is also included within the scope of the patent." *Id.* at 1324 (internal quotation omitted).

According to Cisco, this "has nothing to do with whether products landing in U.S. airports or

passing through customs bonded zones are deemed imported into the United States under §

271(a)."[1]

SynQor also cites *Cybiotronics, Ltd. v. Golden Source Elec., Ltd.*, 130 F. Supp. 2d 1152,

1175 (C.D. Cal. 2001), wherein the court noted that the "parallel use of 'imports into the United

---

[1] SynQor also references several cases discussing the meaning of imports in contexts other than Title 35. *See Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122 (1923); *see also Canton R.R. Co. v. Rogan*, 340 U.S. 511, 515 (1951) ("to import means to bring into the country"); *Zoltek Corp. v. United States*, 672 F.3d 1309, 1326 (Fed. Cir. 2012) ("[i]mportation occurs when the product crosses the United States' border" in the context of 28 U.S.C. § 1498); *United States v. Commodities Export Co.*, 972 F.2d 1266, 1270 (Fed. Cir. 1992) (concluding the defendant conducted an "import transaction" by "bringing [the] merchandise into the United States"); *Loblaw Groceterias, Inc. v. United States*, 22 C.C.P.A. 479, 482 (1935) (following *Cunard*). According to SynQor, there is no reason to reach a different result here.   However, Cisco correctly notes terms have different meanings between statutes, and some courts explicitly limit interpretation to the particular statute at issue. *See, e.g., U.S. v. Commodities Exp. Co.*, 972 F.2d 1266, 1269 (concluding that the meaning of "importation" under Title 19 is not applicable to 28 U.S.C. § 1582(2)); *see also Zoltek*, 672 F.3d at 1326 (emphasizing "nothing in this opinion should be construed to affect our Title 35 jurisprudence").

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 19 of 23
PageID #: 41577

States' language means that cases construing the 'imports' language of Section 271(g) may provide some guidance" regarding the same language in § 271(a). However, *Cybiotronics* strongly supports Cisco's position. There, the defendant Smoothline filed a motion for summary judgment under § 271 claiming lack of infringing activity within the United States. The plaintiff pointed to the following "evidence" of four "facts" that arguably showed Smoothline "import[ed]" accused products: (1) Smoothline sent working samples of the accused products to NAFT in New York; (2) Smoothline arranged to ship its accused products into the Port of Los Angeles; (3) Smoothline at times took accused products out of containers on ocean liners and sent them via air transit to NAFT; and (4) Smoothline itself shipped accused products to testing labs in the U.S. via DHI. *Id.* at 1173. The court noted it was undisputed that Smoothline did send working samples of its products to NAFT in the U.S. and that Smoothline sent samples (via DHL) to U.S. labs for testing. *Id.* at 1174. The question before the court was whether these "shipments" constituted "imports into the United States" for purposes of liability under § 271(a). *Id.*

The court held it did not constitute "imports." Assuming Smoothline did send samples of its products to New York, that it sent samples to American labs for testing purposes, and that it took an active role in coordinating NAFT's shipments, "none of these activities transform[ed] Smoothline from the 'exporter' in this transaction into the 'importer' subject to liability under U.S. patent laws." *Id.* at 1175-76. According to the court, "Smoothline's shipments of samples for approval or testing were not for purposes of any direct commercial benefit, nor were they items that were being transmitted for purposes of sale." *Id.* at 1176. There was therefore no basis for concluding that these alone were "imports into the United States" under § 271(a). *Id.*

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 20 of 23
PageID #: 41578

SynQor notes Smoothline was not liable for infringement because a third party was determined the importer. However, the *Cybiotronics* court also specifically found shipments into the U.S. of samples for approval or testing were not for commercial purposes, nor were they items that were being transmitted for purposes of sale. The Western District of Michigan found the reasoning persuasive, noting "imports" likely means bringing a product into the country for purposes of sale under the patent statute. *Donnelly Corp. v. Reitter & Schefenacker GmbH & Co. KG*, 189 F. Supp. 2d 696, 703, n. 9 (2002) (citing *Cybiotronics*, 130 F. Supp. 2d at 1176).

The Court finds persuasive *Cybiotronics* and the other cases interpreting § 271(a) relied upon by Cisco. In *Creo Products, Inc. v. Presstek, Inc.*, 166 F.Supp.2d 944 (D.Del. 2001), *aff'd*, 305 F.3d 1337 (Fed. Cir. 2002), the court was unconvinced products imported for trade shows were imports under § 271(a). The evidence in the record demonstrated that an accused device was at a printing press industry trade show in Chicago. *Id.* at 975. According to the *Creo* court, "[s]imply showing the [device] at the trade show . . . is not enough to constitute direct infringement." *Id.* at 976. The court noted there was no evidence that Komori ever imported the device in the U.S. with the intent to sell it. *Id.* According to the court, to hold otherwise could cause foreign companies to "become wary of bringing products into this country to display at trade shows if the mere act of crossing the border with them could result in a finding of direct infringement." *Id.*

Here, the accused products at issue did not even clear customs in the United States. They merely passed through a United States airport, customs bonded zone, or foreign trade zone while in transit from one foreign country to another foreign country. Considering all of the case law applying § 271(a), these pass through shipments do not constitute "imports" under § 271(a) and are not enough to constitute direct infringement without evidence the shipments were for

Case 2:14-cv-00286-MHS-CMC   Document 200   Filed 09/29/14   Page 20 of 22 PageID #:
41616
Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 21 of 23
PageID #: 41579

commercial purposes or were for purposes of sale. *Cybiotronics*, 130 F. Supp. 2d at 1176; *see also Black & Decker, Inc. v. Shanghai Xing Te Hao Indus. Co.*, 2003 WL 21383325, *10 (N.D. Ill. June 13, 2003) ("[S]imply bringing a product in the United States for display at a trade show does not constitute importation under § 271(a) absent evidence that the corporation brought the particular product into the United States with intent to sell it.")(citing *Creo*, 166 F. Supp. 2d at 976).

4.    **Policy Considerations**

Finally, Cisco asserts interpreting § 271(a) to include pass through shipments would be inconsistent with the policy underlying all U.S. patent law that limits a patent holder's rights to excluding infringing activity within the united States. *See Microsoft Corp. v. AT&T Corp.* 550 U.S. 437, 454-55 (2007)("The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law."). Cisco also references a Supreme Court case from 1856 in which the Supreme Court rejected the argument that the law presumes patent damages by mere arrival of a patented article at a U.S. port:

> [S]uch a construction would be inconsistent with the principles that lie at the foundation of these laws; and instead of conferring legal rights on the inventor, in order to do equal justice between him and those who profit by his invention, they would confer a power to exact damages where no real damage has been sustained, and would moreover seriously embarrass the commerce of the country with foreign nations.

*Brown v. Duchesne*, 60 U.S. 183, 197 (1856). SynQor correctly notes *Duchesne* predates the addition of "imports" to § 271(a) by over a century. However, the principal of overreach as discussed in the *Duchesne* case applies, as SynQor's pass through importation theory would allow it to "exact damages where no real damage ha[s] been sustained," at the expense of a chilling effect on international commerce. *Id.*

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 22 of 23
PageID #:  41580

Although Cisco's expert on commercial shipping, Daniel Adkins, acknowledges there is a U.S. policy interest in enforcing and protecting patent rights, Cisco asserts SynQor's interpretation of § 271(a) would disrupt the international transportation network, which depends on the ability to transit goods freely through U.S. soil without clearing customs.  (Docket Entry # 96 at pg. 8).  As Mr. Akins has explained:

> This means that if SynQor is successful and forces manufacturing companies to somehow divert cargo from entering the geographical territory of the United States, *even if aboard an aircraft merely landing to refuel*, the loss of efficiency in their distribution system could be substantial, harming U.S. based companies and U.S. based air carriers. The theory of 'pass through' infringement . . . poses a risk to global trade, with the potential to cause a rerouting of trade around, rather than through, the United States, negatively affecting jobs and economic benefits in the United States.

*See* Akins Report, ¶ 64 (emphasis added); *see also id.* at ¶¶ 55-64, 77 (describing the potential adverse consequences to global logistics and international trade of a ruling that products merely passing through the United States en route between two non-U.S. locations are infringing "imports"). According to Cisco, SynQor's theory would allow any party that ships products through U.S. airspace or territory to be sued for patent infringement, even though those products never affect the U.S. market for the patentee's goods at all. Such a broad interpretation of § 271(a) , Cisco asserts, would not only extend the patentee's monopoly beyond the limits intended by Congress, but would also chill international trade. *See* Akins Decl. Ex. 1, ¶ 56 ("[T]he disruptions to the supply chain of companies involved in global logistics could be substantial and the impact on U.S. airports and air carriers will spread as other global manufacturers will likely be forced to route traffic around the United States as others pursue 'pass through' cases.").

Policy considerations support Cisco's position. For all of these reasons discussed herein, the Court finds Cisco's pass through shipments do not constitute imports under § 271(a).

Case 2:14-cv-00286-MHS-CMC   Document 196-1 *SEALED*   Filed 09/25/14   Page 23 of 23 PageID #: 41581

B.     Whether a fact issue exists as to whether Cisco is the "importer"

Because the Court finds pass through shipments are not imports under § 271(a), the issue of who owns the allegedly infringing products shipped from Mexico to non-U.S. destinations by passing through the U.S. is moot.

Based on the foregoing, it is

RECOMMENDED that SynQor, Inc.'s Motion for Partial Summary Judgment (Docket Entry #91) be DENIED.  It is further

RECOMMENDED that Cisco Systems, Inc.'s Motion for Partial Summary Judgment (Docket Entry #96) be GRANTED.  It is further

RECOMMENDED that it be ordered that shipments of accused Cisco products that "pass through" the United States en route from one foreign destination to another foreign destination are not acts of "importation" that constitute infringement under 35 U.S.C. § 271(a).

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice.  *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir.1988).

SIGNED this 11th day of August, 2014.

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE